714 F.2d 238
 13 Fed. R. Evid. Serv. 849
 UNITED STATES of America
v.
Ghassan L. AMMAR, Neil Roger McFayden, Judith Ammar, Ibraham
Ammar, Abedeen Ammar, Naim Dahabi, Charles Rossi,
Michael Dugan, Marshall Stillman.
Appeal of Ghassan L. AMMAR, Neil Roger McFayden, Judith
Ammar and Marshall Stillman.
 Nos. 81-1745, 81-1746, 81-1865 and 81-2064.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 10, 1983.
Decided June 30, 1983.
Rehearing and Rehearing En Banc Denied July 22, 1983.
Certiorari Denied Oct. 31, 1983.
See 104 S.Ct. 344.
 
 Paul J. Brysh (argued), Asst. U.S. Atty., J. Alan Johnson, U.S. Atty., John J. Mead, Legal Intern, Pittsburgh, Pa., for United States.
 
 
 1
 Philip B. Friedman (argued), Leonard G. Ambrose, III, Michelle M. Hawk, Ambrose & Friedman, Erie, Pa., for Ghassan Ammar.
 
 
 2
 Andrew J. Conner (argued), Dunn & Conner, Erie, Pa., for Judith Ammar; James M. Shellow (argued), Stephen M. Glynn, Shellow, Shellow & Glynn, Milwaukee, Wis., of counsel.
 
 
 3
 Stephen A. Saltzburg, University of Virginia, School of Law, Charlottesville, Va., for Marshall Stillman.
 
 
 4
 Michael M. Palmisano, Erie, Pa., for Neil Roger McFayden.
 
 
 5
 Before WEIS, SLOVITER and BECKER, Circuit Judges.
 
 OPINION OF THE COURT
 
 6
 SLOVITER, Circuit Judge.
 
 
 7
 These are consolidated appeals from judgments of conviction arising out of a conspiracy for the importation and distribution of heroin. After full consideration of the numerous arguments raised by appellants, we affirm the judgments below in all respects.
 
 I.
 FACTS
 
 8
 The indictment named nine defendants and two unindicted coconspirators. Three of the named defendants, Ibraham Ammar, Abedeen Ammar, and Naim Dahabi, were fugitives at the time of trial; two other defendants, Charles Rossi and Michael Dugan, pleaded guilty and testified for the government; the remaining four defendants, Ghassan Ammar, Judith Ammar, Marshall Stillman, and Roger McFayden, stood trial, were convicted by the jury and now appeal. The unindicted coconspirators were John Welkie and Gilbert Bunner, both of whom testified at the trial.
 
 
 9
 The conspiracy spanned the period from January 1980 to October 1980. It involved the importation of heroin from Lebanon through Toronto and New York, and was centered on Ghassan Ammar, who lived with his wife Judith in Erie, Pennsylvania, where they had a leather importing business. The Lebanese sources of the heroin were Ghassan's father, Ibraham; his uncle, Abedeen; and Naim Dahabi.
 
 
 10
 Briefly summarized, the evidence at trial, viewed in the light most favorable to the government, showed the following: In January 1980, at a meeting between Ghassan, Judith and Welkie, Ghassan told Welkie that his father and uncle could supply heroin for importation into the United States. In May 1980, Ghassan and Judith, together with Dugan and Welkie, drove from Erie to the Toronto airport where they met Ghassan's uncle, Abedeen Ammar, with whom they returned to Erie transporting heroin in hollowed-out chair legs in Abedeen's luggage. In early June 1980, Judith, Ghassan, and their infant son, together with Dugan and Rossi, flew from New York abroad to Amsterdam, where Dugan and Rossi remained while the Ammars flew on to Beirut. Shortly thereafter, Ghassan and his father, Ibraham Ammar, rejoined Dugan and Rossi (Judith stayed behind in Beirut), and the four flew to New York with heroin again concealed in hollowed-out chair legs. From New York, the four men drove to Rossi's home in Chester, Pennsylvania. Ghassan, Ibraham, and Rossi flew on to Detroit, where Ghassan met with Marshall Stillman, and then returned to Erie. During the next week, they made two additional trips to Detroit, where Ghassan again met with Stillman and transferred heroin to him. In early July 1980, Ghassan flew to Beirut, where he rejoined Judith; the two returned to New York on July 4, carrying heroin concealed on Judith's person and in their baby's diaper, and were met by Rossi, Welkie, and Ibraham. In mid-July, at Ghassan's suggestion, Rossi flew to Beirut, where he was met by Ibraham and Abedeen, and acquired additional heroin from them. Later in July, Ghassan, Welkie and Bunner travelled to Detroit where Ghassan met with Stillman and sold him heroin. After receiving a phone call from Judith, the three returned to Erie, and together with Judith drove to Toronto, where they met Naim Dahabi, who had arrived in Canada with heroin concealed in hollowed-out chair legs. They then drove to Detroit, where Ghassan, Dahabi and Welkie met with Stillman. On this occasion, Welkie delivered some heroin to a friend of Stillman's pursuant to Stillman's instructions.
 
 
 11
 During this same period, Ghassan and McFayden were involved in sales of heroin to McFayden's friend "Frank," who was in fact Francis Schmotzer, an undercover agent of the Drug Enforcement Administration. Ghassan and McFayden sold heroin to Schmotzer twice in May 1980. In late June, after their return from Detroit, Ghassan and Rossi met McFayden and Schmotzer and discussed additional heroin sales. On July 31, Ghassan, McFayden, Welkie and Bunner arranged a third sale to Schmotzer. McFayden and Bunner were arrested immediately. Welkie fled by car, but surrendered several days later in Philadelphia. Ghassan, who was not present at the sale, surrendered August 1. On August 29, a four count indictment was returned against Ghassan, McFayden and Welkie, also naming Bunner as an unindicted coconspirator.
 
 
 12
 Meanwhile, in early August, Rossi returned from Lebanon with heroin, and was met by Dugan. Rossi and Dugan were arrested on August 12 after attempting to arrange the sale of a portion of the heroin to a state undercover agent in order to raise Welkie's bail. Rossi was released, but continued to attempt to sell the heroin, and was arrested again on October 2. Welkie also was released after agreeing to cooperate with the government, and on September 19, at the instigation of the government, had a conversation with Judith who asked him to sell some heroin to raise bail for Ghassan's release. Judith was subsequently arrested. Finally, Stillman was arrested in Detroit on October 15.
 
 
 13
 On October 10, a superseding eight-count indictment was returned in the Western District of Pennsylvania. Count I charged the nine defendants (Ghassan, Judith, Ibraham, Abedeen, McFayden, Dahabi, Rossi, Dugan, and Stillman) and the unindicted coconspirators (Welkie and Bunner) with conspiracy to distribute and possess with intent to distribute heroin, in violation of 21 U.S.C. § 841(a)(1). Count II charged all defendants with conspiracy to import heroin into the United States, in violation of 21 U.S.C. §§ 952(a) and 960(a)(1). Counts III, IV and V charged Ghassan and McFayden with three substantive violations of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 based on their sales of heroin to Schmotzer on May 2, May 20, and July 31. Count VI charged Rossi and Dugan with a substantive violation of 21 U.S.C. § 952(a) based on their importation of heroin in June 1980 from Amsterdam. Count VII charged Abedeen, Ghassan, Judith, and Dugan with a substantive violation of 21 U.S.C. § 952(a) based on their importation of heroin from Toronto in May 1980. Count VIII charged Ghassan, Judith, and Dahabi with a substantive violation of 21 U.S.C. § 952(a) based on their importation of heroin from Toronto in July 1980.
 
 
 14
 Rossi and Dugan pleaded guilty to Count I and testified on behalf of the government. Welkie and Bunner, the unindicted coconspirators, pleaded guilty to a conspiracy charge in a related indictment, and also testified for the government. Of the four defendants who were tried, Ghassan, Judith, McFayden and Stillman, only Judith testified. All were found guilty as to each count in which they were named. Ghassan received seven concurrent fifteen-year sentences, a total fine of $30,000, and concurrent three-year special parole terms on all but Counts I and II. Judith received four concurrent five-year terms. McFayden received five concurrent eight-year sentences. Stillman was sentenced to concurrent twelve-year terms on the two conspiracy counts, and was fined $10,000.
 
 
 15
 Appellants in their briefs have made some fifty separate claims of trial error, which are set out in the Appendix to this opinion. We have considered each claim, many of which we find to be patently without substance, and have determined that none warrants reversal of the judgments below. We examine separately only those issues which we believe merit further discussion.[1]
 
 II.
 ADMISSIBILITY OF COCONSPIRATOR STATEMENTS
 
 16
 One of the principal contentions of error concerns the admission of the testimony of out-of-court statements made by members of the conspiracy. The court permitted Rossi, Welkie, and other witnesses to testify about statements made by the other conspirators on the theory that these were coconspirator statements admissible under Fed.R.Evid. 801(d)(2)(E).[2]
 
 
 17
 A coconspirator statement may be admitted under Fed.R.Evid. 801(d)(2)(E) if it meets three conditions: (1) there must be independent evidence establishing the existence of the conspiracy and connecting the declarant and defendant to it; (2) the statement must have been made in furtherance of the conspiracy; and (3) it must have been made during the course of the conspiracy. See, e.g., United States v. Perez, 658 F.2d 654, 658 (9th Cir.1981). Because appellants claim these requirements were not met as to at least some statements, we consider each requirement in turn.
 
 A.
 INDEPENDENT EVIDENCE OF CONSPIRACY
 
 18
 1. Necessity of an in limine hearing.
 
 
 19
 In United States v. Continental Group, Inc., 603 F.2d 444, 457 (3d Cir.1979), cert. denied, 444 U.S. 1032, 100 S.Ct. 703, 62 L.Ed.2d 668 (1980), we held that as a prerequisite for the submission of coconspirator statements to the jury, the court must determine that the government has "established the existence of the alleged conspiracy and the connection of each defendant with it by a clear preponderance of the evidence independent of the hearsay declarations."[3] This determination is to be made by the court before the coconspirator statements are submitted to the jury. See United States v. James, 590 F.2d 575, 581 (5th Cir.) (in banc), cert. denied, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979).
 
 
 20
 Appellants contend that before allowing the introduction of any coconspirator statement the district court should have held a preliminary hearing at which the determination referred to above should have been made.[4] In United States v. James, 590 F.2d at 581-82, on which they rely, the Fifth Circuit expressed its preference for requiring the government to establish the existence of the conspiracy and each defendant's participation in it by independent evidence before admitting any coconspirator declarations. Even that court has clarified that while preferable, this is not a mandatory procedure. See United States v. Montemayor, 703 F.2d 109, 116-17 (5th Cir.1983).
 
 
 21
 Our approach has not been dissimilar, but we have emphasized that "the control of the order of proof at trial is a matter committed to the discretion of the trial judge." United States v. Continental Group, Inc., 603 F.2d at 456; See United States v. American Radiator & Standard Sanitary Corp., 433 F.2d 174, 195 (3d Cir.1970), cert. denied, 401 U.S. 948, 91 S.Ct. 928, 28 L.Ed.2d 231 (1971); see also United States v. Perez, 658 F.2d at 658 n. 2 ("Unlike the Fifth Circuit, this court [the Ninth Circuit] has declined to express a 'preference' for pretrial determination of admissibility of the coconspirator's statements"). In Continental Group, the government had been allowed to introduce coconspirator statements without a prior showing of a conspiracy based on independent evidence, subject to the requirement that the government make such a showing by the close of its case. We held that such a procedure, while it should be "carefully considered and sparingly utilized," was not an abuse of discretion in a complex conspiracy case involving multiple defendants and a "large amount of interrelated testimony." 603 F.2d at 457.
 
 
 22
 In this case, the district court denied appellants' motion for a pre-trial hearing on the admissibility of coconspirator statements on the ground that it would involve "a mini-trial", but stated,
 
 
 23
 that at the request of the defendant at any time prior to testimony by a co-conspirator, the court will determine whether there is or is not sufficient threshold evidence of a conspiracy of which defendant was a member or what specifically must still be proved and the government, of course, will be required to submit such further evidence or else suffer the possibility of a mistrial.
 
 
 24
 The court is of the opinion that Rule 104(b) of the Federal Rules of Evidence does not demand more.
 
 
 25
 We cannot say that in the circumstances of this case the district court erred or that its refusal to hold a pre-trial hearing under Fed.R.Evid. 104 was an abuse of discretion.[5]
 
 
 26
 2. Adequacy of the Trial Court's Findings.
 
 
 27
 Appellants claim that the court failed to make the determination of a conspiracy in which they participated before submitting the coconspirator statements to the jury. However, in the course of various rulings during the trial, the trial judge stated that he had made such a determination.[6] In addition, at the charging conference the judge stated that he had made "the determination that there was threshold evidence of the conspiracy ... rather early in the case, the second or third day." Tr. 4712. In light of the trial judge's statements, we reject appellants' contention that no such determination was made. Moreover, we have held that even in the absence of explicit findings by the trial court, the necessary threshold determination is implicit in the court's decision to send the case to the jury. Government of the Virgin Islands v. Dowling, 633 F.2d at 665; United States v. Continental Group, Inc., 603 F.2d at 460; see also United States v. Lutz, 621 F.2d 940, 947 (9th Cir.), cert. denied, 449 U.S. 859, 101 S.Ct. 160, 66 L.Ed.2d 75 (1980); United States v. Green, 523 F.2d 229, 233 n. 4 (2d Cir.1975), cert. denied, 423 U.S. 1074, 96 S.Ct. 858, 47 L.Ed.2d 84 (1976).
 
 
 28
 Appellants claim that the court used the wrong standard of proof in making the required threshold determination. We, along with most other circuits, require that "the prosecution must lay a foundation for the admission of coconspirator hearsay by establishing the existence of a conspiracy including the defendant by 'a fair preponderance of independent evidence.' " United States v. Trotter, 529 F.2d 806, 811 (3d Cir.1976); see Government of the Virgin Islands v. Dowling, 633 F.2d at 665. Accord United States v. Santiago, 582 F.2d 1128, 1129, 1133-36 (7th Cir.1978); United States v. Petrozziello, 548 F.2d 20, 23 (1st Cir.1977). But see United States v. James, 590 F.2d at 580-81 (substantial evidence standard); United States v. Dixon, 562 F.2d 1138, 1141 (9th Cir.1977), cert. denied, 435 U.S. 927, 98 S.Ct. 1494, 55 L.Ed.2d 521 (1978) (prima facie standard). See generally 1 Weinstein & Berger, Weinstein's Evidence p 104, at 104-52--104-55. Appellants contend that the district court used the lesser "prima facie" standard. It would have been error had the district court reduced the burden on the government in this manner. See United States v. Trowery, 542 F.2d at 627; United States v. Trotter, 529 F.2d at 812. However, we believe the trial court was aware of and applied the correct standard, notwithstanding the references to "prima facie" case which the court made on two occasions in this long trial.
 
 
 29
 During a side-bar conference early in the trial the judge stated:
 
 
 30
 The Court: I found there was sufficient threshold evidence of a conspiracy. But, nevertheless, that does not permit [sic] other attacks on credibility or showing the conspiracy never existed or anything else. The mere fact I make a determination means a prima facie case.
 
 
 31
 [Stillman's Attorney]: Has the Court made a determination as a prima facie case without having a 104 hearing?
 
 
 32
 The Court: I find there is.
 
 
 33
 Tr. 432g-h (emphasis added).
 
 
 34
 The only other reference to which appellants have directed our attention appears in the charging conference during a discussion as to the difference between the "preponderance" standard and the "beyond a reasonable doubt" standard, which was relevant to the court's proposal to submit the threshold determination to the jury. The court stated:
 
 
 35
 As I read this, that preponderance of the evidence is for my thinking when I first make the determination that there was threshold evidence of the conspiracy which I made rather early in the case, the second or third day. I think I told you people that I had considered it and on the basis of things produced up to then, I thought there was prima facie evidence of a conspiracy or threshold evidence of a conspiracy so as to justify the introduction.
 
 
 36
 I think that is what that has to do with it. But then to go on and say whether an individual defendant is part of the conspiracy is something the jury has to find beyond a reasonable doubt.
 
 
 37
 Tr. 4712-13 (emphasis added).
 
 
 38
 These two references to a "prima facie" case, though troubling, do not persuade us that the district court adopted an improper standard. The first reference was made in a context unrelated to the issue of standard of proof and seems to us a slender reed upon which to base a claim of reversible error. The second reference, while imprecise, is insufficient to support the conclusion that the district court employed the wrong standard. When read in full context, it demonstrates that the court understood that it had to find evidence of a conspiracy by the "preponderance" standard. The references to the "preponderance" standard by both the court and counsel during this colloquy reinforce our view.
 
 
 39
 We are not prepared to seize on one or two isolated phrases to conclude that the court misunderstood the standard that it was to apply. Appellants' present emphasis on the court's passing remarks seems to us an attempt to invest them with greater significance than they merit or than they were understood to have at the time. Significantly, appellants' attorneys registered neither surprise nor objection to either statement. They did not seek clarification from the court; indeed, Stillman's attorney repeated the phrase "prima facie case" in his response to the first statement. In United States v. Pappas, 611 F.2d 399 (1st Cir.1979), the First Circuit considered a similar claim of error in a case where the district court had clearly articulated a "prima facie" standard despite the circuit's adherence to a "preponderance" standard. The court held that since counsel had failed to object to the judge's ruling at trial, it could review only for plain error. After noting that "there was more than sufficient evidence to justify a ruling under the proper ... standard," the court concluded that the failure to apply the correct standard did not rise to the level of plain error, stating that "it is possible--indeed in the circumstances it seems likely--that his articulation of an incorrect standard was a slip of the tongue which would have been quickly rectified had the error been brought to his attention." Id. at 405. Even were the trial court in this case to have employed the wrong standard we also would be inclined to view it as harmless error, since we are persuaded that the evidence of conspiracy and each defendant's participation was sufficient to satisfy the "preponderance" standard.
 
 
 40
 Appellants also claim that it was error to instruct the jury that only after it was satisfied by independent evidence of a defendant's membership in the conspiracy beyond a reasonable doubt could it consider the out-of-court statements of coconspirators. Appellants contend that by giving this charge, the court improperly delegated its responsibility for making the necessary threshold determination to the jury, and so confused the jury as to render its verdict meaningless.
 
 
 41
 As we stated above, the district court made the threshold determination required by Rule 801(d)(2)(E) before allowing the coconspirator statements to go to the jury. Since this determination is for the court, it was unnecessary and inappropriate to instruct the jury that it could only consider the coconspirator declarations if it too determined, based on evidence aliunde, that a given defendant was a member of the conspiracy. Once the coconspirator statements are admitted they should go "to the jury without special instruction." United States v. Trowery, 542 F.2d at 627; United States v. Bey, 437 F.2d 188 (3d Cir.1971); see also United States v. James, 590 F.2d at 577-80.[7]
 
 
 42
 However, while the trial court's instruction was superfluous, we do not believe that it caused appellants any prejudice. In United States v. Continental Group, Inc., 603 F.2d at 459, we rejected a challenge to an almost identical charge, stating:
 
 
 43
 No court has held, however, that an instruction that gives the jury an opportunity to second-guess the court's decision to admit coconspirator declarations, otherwise inadmissible as hearsay, is reversible error prejudicing the defendant. To the contrary, it has been generally held that, so long as the court fulfills its responsibility to make the initial determination, such a charge only provides a windfall to the defendant.
 
 
 44
 Furthermore, defendants did not object to this portion of the charge; at the charging conference Stillman's attorney conceded that the instruction was more favorable to defendants than they were entitled. Tr. 4710. At trial it was the government which objected to the instruction now challenged by appellants. Tr. March 4, 1981 (charge of court), at 54-55. We find that the error in instructing the jury to make a superfluous finding was not prejudicial.
 
 
 45
 In summary, we are satisfied that the district court understood its obligation to make a finding based on evidence aliunde of the existence of a conspiracy of which each defendant was a member before allowing the jury to consider any coconspirator declarations against that defendant. It would, of course, have been preferable for the court to have more clearly articulated on the record its determinations and the bases for them, but we have never made that an absolute requirement. United States v. Continental Group, Inc., 603 F.2d at 457, 460. It is also true that the court was not always as precise or as clear as it might have been. But this was a complex trial, with a record running to several thousand pages. Having reviewed the record as a whole, we are not prepared to conclude that the occasional confusion evidenced in the record was such as to constitute reversible error.
 
 
 46
 3. Sufficiency of the Evidence Aliunde.
 
 
 47
 We must still review the evidence to determine if the district court had "reasonable grounds" to make its finding. United States v. Continental Group, 603 F.2d at 460; United States v. Bey, 437 F.2d at 196. We do not understand appellants Ghassan, Judith, and McFayden to seriously challenge the sufficiency of the evidence aliunde to support a finding of their participation in the conspiracy; in any event, we are satisfied that it was more than sufficient to do so. Appellant Stillman, however, does vigorously contest the finding of his participation in the conspiracy. The evidence aliunde as to him is substantially less, but we conclude that it was nevertheless sufficient to support the court's finding.
 
 
 48
 The threshold evidence offered by the government need not be overwhelming. The preponderance standard simply requires the prosecution to present sufficient proof leading the trial judge to find "that the existence of the contested fact is more probable than its nonexistence." United States v. Trotter, 529 F.2d at 812 n. 8. Furthermore, in reviewing the district court's determination of proof of a defendant's participation in a conspiracy by a preponderance of the evidence aliunde, the evidence "must be considered in the light most favorable to the government." United States v. Provenzano, 620 F.2d 985, 999 (3d Cir.1980).
 
 
 49
 Both Stillman and the government are in agreement that the strongest independent evidence against him was Welkie's testimony that during the July meeting with Stillman in Detroit, Ghassan told Welkie to get a package from their hotel room which Welkie knew to contain heroin, and that when he returned with the package Stillman told him to deliver it to an unidentified man whom Welkie had previously seen with Stillman and whom Welkie characterized as Stillman's friend. Stillman contends that this was insufficient to permit the trial court to make the threshold determination of Stillman's participation in the conspiracy. He claims that even this testimony could not be properly relied on because Welkie's description of the unidentified man as Stillman's friend was not shown to be based on his personal knowledge. However, the inculpatory aspect of Welkie's testimony lies not in the precise relationship between Stillman and the unidentified man, but rather in the fact that Stillman directed Welkie to deliver a package which Welkie knew to contain heroin to the man. As to that, Welkie's testimony makes clear that he was speaking from personal observation.
 
 
 50
 We find similarly unpersuasive Stillman's contention that Welkie's testimony must be discounted because the trial court improperly limited his impeachment of Welkie and generally failed to consider Welkie's credibility in making its "preponderance" finding. While Stillman's cross-examination of Welkie was limited in some respects, there was ample cross-examination as to the two principal matters Stillman relies on as impeaching, i.e., Welkie's prior inconsistent statements to government officials and to the grand jury and his use of drugs. Since these matters were placed in evidence, we believe that any additional cross-examination by Stillman would have been merely cumulative. We find no support for Stillman's suggestion that the trial court failed to consider Welkie's credibility in making its determination based on a preponderance of the evidence. We will not assume that the court ignored a portion of the evidence before it simply because its ultimate determination was unfavorable to appellant.
 
 
 51
 In addition to Welkie's testimony as to the delivery of the package there was additional independent evidence, albeit largely circumstantial, of Stillman's participation in the conspiracy. This evidence included testimony of the repeated meetings between Stillman and various members of the conspiracy coinciding with the heroin importations, Rossi's testimony that on one of the trips to Detroit for a meeting with Stillman he saw heroin in the trunk of Ghassan's car, and Welkie's testimony that on another trip to Detroit, Ghassan obtained some heroin from Welkie, then met with Stillman, and was shortly thereafter seen by Welkie with between $30,000 and $35,000 in cash in his hotel room. Mere association with those who have conspired cannot alone support a conviction for conspiracy. United States v. Torres, 519 F.2d 723, 725-26 (2d Cir.), cert. denied, 423 U.S. 1019, 96 S.Ct. 457, 46 L.Ed.2d 392 (1975). On the other hand, the timing and circumstances of a meeting or series of meetings may be sufficiently suspicious to permit a reasonable inference of complicity in the criminal enterprise. See United States v. Gonzalez, 700 F.2d 196, 203 (5th Cir.1983); United States v. Baldarrama, 566 F.2d 560, 565 (5th Cir.), cert. denied, 439 U.S. 844, 99 S.Ct. 140, 58 L.Ed.2d 145 (1978); United States v. Torres, 519 F.2d at 726. Moreover, the issue before us is not whether the evidence aliunde was sufficient to support a judgment of conviction beyond a reasonable doubt, but rather whether the government has satisfied the far lesser burden to make a threshold showing of conspiracy by a preponderance of the evidence.
 
 
 52
 The only independent exculpatory evidence to which Stillman directs our attention is his impeachment of Welkie. In United States v. Provenzano, supra, appellant similarly argued that the only evidence aliunde against him came from "a biased liar." We rejected that contention on the ground that, on appellate review, the witness's statements "must be accepted as true for the purpose of determining the sufficiency of evidence." 620 F.2d at 999. We concluded that "[a]lthough the evidence is not overwhelming, and while it comes from only one witness whose veracity was certainly open to question, it was sufficient to establish a conspiracy and to tie [appellant] to that conspiracy." Id. at 1000. In this case, we have not only Welkie's testimony, but substantial circumstantial evidence based on the testimony of Rossi and others. We therefore conclude that the district court could reasonably have found Stillman's participation in the conspiracy by a preponderance of the evidence aliunde.
 
 B.
 IN FURTHERANCE OF THE CONSPIRACY
 
 53
 The second requirement for the admission of out-of-court statements by coconspirators is that they be made in furtherance of the conspiracy. Appellants claim that the district court failed to observe this requirement as to a number of statements.
 
 
 54
 The most sweeping challenge on this ground is Stillman's contention that virtually all of the out-of-court declarations attributed to Ghassan were inadmissible as coconspirator statements because Ghassan was acting as a government informant when he made the statements, and hence they were not in furtherance of the conspiracy. It is undisputed that Ghassan, both prior to and during the period of the conspiracy, had acted as a confidential informant for both the DEA and Pennsylvania authorities. In fact, the basis of Ghassan's defense was that he had been acting as a government agent when he engaged in the actions charged in the indictment. The government contended that as to the events charged in the indictment, Ghassan was acting on his own. The trial court was aware of Ghassan's theory of defense at the inception of the trial.[8] Thus, when it admitted Ghassan's statements, it implicitly rejected Stillman's claim that Ghassan's statements were not in furtherance of the conspiracy.[9] The jury reached a similar conclusion under the higher beyond a reasonable doubt standard since its verdict reflected its rejection of Ghassan's informant defense.[10]
 
 
 55
 Stillman makes a similar challenge to the admission of a taped telephone call which Rossi placed to Ibraham at the instigation of the government shortly after Rossi's initial August 12 arrest. Its purpose was apparently to lure Ibraham back to the United States from Beirut. Stillman argues that since Rossi was concededly acting on behalf of the government at the time he placed the call, the conversation did not meet the in furtherance requirement of Rule 801(d)(2)(E). The trial court instructed the jury that because Rossi was acting as a government agent at the time he made the phone call, Rossi's statements could not be considered as evidence against any of the defendants and should be disregarded, but that Ibraham's statements, or anything said by Rossi and adopted by Ibraham, could be considered.
 
 
 56
 Stillman argues that the evidence was highly prejudicial because it included a statement by Rossi that he had attempted to contact Stillman after learning of the arrest of some of the conspirators, but that Stillman would not talk to him because "it looks like Marshall's [Stillman] scared or something." Stillman claims that the statement created a "false implication of Stillman's consciousness of guilt" because Rossi had never attempted to contact Stillman. Stillman's Brief at 34. To meet that concern, the court specifically called the jury's attention to the fact that Rossi had testified that he had not met or spoken to Stillman.
 
 
 57
 The primary significance of the Ibraham-Rossi conversation was not the statement on which Stillman focuses but instead was Ibraham's repeated mention of Stillman's name in connection with raising bail money for the arrested conspirators, which suggests his association with them. Since this fact was both relevant and probative, and could not have been considered if Rossi's half of the conversation was excised, the court did not err in admitting it, particularly in view of its cautionary instructions. See United States v. Smith, 623 F.2d 627, 631 (9th Cir.1980).[11]
 
 
 58
 Both Stillman and Judith claim that certain out-of-court statements should not have been admitted because they constituted narratives of past events and thus were not in furtherance of the conspiracy. Judith challenges the admissibility of Ghassan's statements to Welkie and Rossi that when he and Judith returned from Beirut on July 4 they had been checked well at customs, but that the heroin concealed in their baby's diaper and Judith's vagina had not been found. Stillman challenges Ibraham's statement to Ghassan, Judith and Welkie, as recited by Welkie, that Stillman owed them a lot of money for the last shipment of heroin and would have to pay up before he could get another package. Statements between conspirators which provide reassurance, serve to maintain trust and cohesiveness among them, or inform each other of the current status of the conspiracy further the ends of the conspiracy and are admissible so long as the other requirements of Rule 801(d)(2)(E) are met. See United States v. Mason, 658 F.2d 1263, 1270 (9th Cir.1981); United States v. Goodman, 605 F.2d 870, 878 (5th Cir.1979). Such statements are more than "mere narratives" of past events. See United States v. Eubanks, 591 F.2d 513, 520 (9th Cir.1979). They differ from the statements made in United States v. Provenzano, supra, relied on by appellants, which had been made to non-members of the conspiracy who had no need to know about the matters disclosed.
 
 
 59
 We are somewhat more troubled by Judith's testimony that when Ghassan was in the Erie County Jail following his arrest, he told her to try to raise money for his bail by contacting Stillman, who owed them $250,000 for heroin, if she could not get an advance from one of their business customers. Stillman contends that because the conversation took place after Ghassan's arrest, it was not in furtherance of the conspiracy. However, the arrest of a conspirator does not necessarily terminate his or her involvement in the conspiracy. See United States v. Killian, 639 F.2d 206, 209 (5th Cir.), cert. denied, 451 U.S. 1021, 101 S.Ct. 3014, 69 L.Ed.2d 394 (1981). Ghassan's revelation to Judith of his relationship with Stillman was for the purpose of enabling her to collect money owed as a result of the heroin transactions. The in furtherance requirement must be given the same practical interpretation as the pendency requirement. The distribution of the proceeds of a conspiracy is one of its central objectives, and statements which are directed to that purpose must be considered to be in furtherance of the conspiracy. See United States v. Fortes, 619 F.2d 108, 117 (1st Cir.1980); United States v. Hickey, 596 F.2d 1082, 1089-90 (1st Cir.), cert. denied, 444 U.S. 853, 100 S.Ct. 107, 62 L.Ed.2d 70 (1979); United States v. Patton, 594 F.2d 444, 447 (5th Cir.1979).[12]
 
 C.
 DURING THE COURSE OF THE CONSPIRACY
 
 60
 Appellants contend that the conspiracy charged in the indictment terminated with the arrest of Ghassan, Welkie, McFayden and Bunner on July 31 and immediately following, and that any conversations thereafter fail to satisfy the final prerequisite for admitting coconspirator statements under Rule 801(d)(2)(E) because they were not made "during the course" of the conspiracy. This contention is based on a misconception. As we have already indicated, the requirements that a statement must be in furtherance of and during the course of the conspiracy are closely linked. The arrest of some of the conspirators, even its principal member, does not necessarily terminate the conspiracy. See United States v. Mason, 658 F.2d at 1269-70 (conspiracy may continue even when all but one coconspirator have been arrested); United States v. Killian, 639 F.2d at 209.
 
 
 61
 A conspiracy is presumed to continue until its objective is achieved. United States v. Corallo, 413 F.2d 1306 (2d Cir.), cert. denied, 396 U.S. 958, 90 S.Ct. 431, 24 L.Ed.2d 422 (1969). Even after the arrests of Ghassan, Welkie, McFayden and Bunner, most of the conspirators remained at large.
 
 
 62
 Where evidence demonstrates that conspirators remain fully capable of carrying out their purpose, notwithstanding the arrest of one of them, it cannot be said that the conspiracy is terminated as a matter of law.... The fact that the conspiratorial object was postponed or slowed down does not unequivocally show that the conspiracy was terminated.
 
 
 63
 United States v. Smith, 600 F.2d 149, 153 (8th Cir.1979) (quoting United States v. Smith, 578 F.2d 1227, 1237 (8th Cir.1978) (Lay, J., concurring)).
 
 
 64
 In this case, there was no evidence of abandonment of the conspiracy; in fact there was affirmative evidence that the conspiracy did indeed continue. After Ghassan's arrest there was an importation of heroin involving Abedeen, Rossi and Dugan, which had previously been arranged by and was at the behest of Ghassan. As with previous importations, the heroin was obtained from the coconspirators in Lebanon. Furthermore, Rossi continued to try to sell the heroin on behalf of the coconspirators until his final arrest on October 2. The conspirators remained in contact with each other and hoped to use funds from that heroin for the release from custody of those arrested. Under these circumstances we cannot assume that the conspiracy terminated until at least Rossi's October arrest.[13] Just as a defendant must produce evidence showing that s/he withdrew from a conspiracy, see United States v. Steele, 685 F.2d 793, 803-04 (3d Cir.1982); United States v. Gillen, 599 F.2d 541, 548 (3d Cir.), cert. denied, 444 U.S. 866, 100 S.Ct. 137, 62 L.Ed.2d 89 (1979), so also must defendants show that the conspiracy terminated, such as by demonstrating that its ends had been so frustrated or its means so impaired that its continuation was no longer plausible.
 
 D.
 PERSONAL KNOWLEDGE REQUIREMENT
 
 65
 Stillman contends that under the rules, a foundation of personal knowledge is required before coconspirator statements can be admitted under Rule 801(d)(2)(E). Fed.R.Evid. 602 provides that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter." However, it is clear from the Advisory Committee Notes that the drafters intended that the personal knowledge foundation requirement of Rule 602 should apply to hearsay statements admissible as exceptions under Rules 803 and 804 but not to admissions (including coconspirator statements) admissible under Rule 801(d)(2).[14] See McCormick, Handbook of the Law of Evidence § 262, at 628 (2d ed. 1972); cf. Mahlandt v. Wild Canid Survival & Research Center, Inc., 588 F.2d 626, 630-31 (8th Cir.1978) (personal knowledge requirement does not apply to Fed.R.Evid. 801(d)(2)(D)). Accordingly, we reject Stillman's argument.[15]
 
 E.
 THE CONFRONTATION CLAUSE
 
 66
 Stillman contends that even if the coconspirator statements were properly admitted under the Federal Rules of Evidence, their admission violated his rights under the Confrontation Clause of the Sixth Amendment. The circuits are divided as to whether a determination that coconspirator statements are admissible under Rule 801(d)(2)(E) is ipso facto determinative that the requirements imposed by the Confrontation Clause are also satisfied. Compare United States v. Papia, 560 F.2d 827, 836 n. 3 (7th Cir.1977) (congruent) and Ottomano v. United States, 468 F.2d 269, 273 (1st Cir.1972), cert. denied, 409 U.S. 1129, 93 S.Ct. 948, 35 L.Ed.2d 260 (1973) (congruent) with United States v. Perez, 658 F.2d 654, 660 & n. 5 (9th Cir.1981) (not congruent) and United States v. Wright, 588 F.2d 31, 37-38 (2d Cir.1978), cert. denied, 440 U.S. 917, 99 S.Ct. 1236, 59 L.Ed.2d 467 (1979) (not congruent). See also United States v. Lurz, 666 F.2d 69, 80-81 (4th Cir.1981) (treating the Rule 801 inquiry and the Confrontation Clause inquiry as the same); United States v. Peacock, 654 F.2d 339, 349-50 & n. 1 (5th Cir.1981) (treating the two inquiries as distinct). We have not yet ruled on this issue.
 
 
 67
 Although the Confrontation Clause and the evidentiary hearsay rules "stem from the same roots," the Supreme Court "has never equated the two." Dutton v. Evans, 400 U.S. 74, 86, 91 S.Ct. 210, 218, 27 L.Ed.2d 213 (1970). If the language of the Confrontation Clause giving a criminal defendant "the right ... to be confronted with the witnesses against him" were to be applied literally, it would preclude use of any hearsay. Ohio v. Roberts, 448 U.S. 56, 62-63, 100 S.Ct. 2531, 2537, 65 L.Ed.2d 597 (1980). The Supreme Court has stated, however, that both history and policy militate against such a literal application. Id. at 63, 100 S.Ct. at 2537. Instead the Court has held that the Confrontation Clause restricts the range of admissible hearsay by imposing a two-prong requirement: first, the government must normally show that the declarant is unavailable and that the hearsay testimony is thus necessary; and, second, the statement must bear sufficient "indicia of reliability" to demonstrate its trustworthiness. Id. at 65-66, 100 S.Ct. at 2538-2539.
 
 
 68
 We need not decide in this case the extent to which the government must show the declarant's "unavailability" when it seeks to introduce coconspirator statements. It is conceded that the declarants were either physically unavailable because they had not yet been apprehended, as in the case of Ibraham and Abedeen, or practically unavailable because they were co-defendants who chose not to testify, as in the case of Ghassan and McFayden.
 
 
 69
 Instead, Stillman argues that the statements fail to meet the "reliability" prong of the Ohio v. Roberts test. The government does not suggest that no reliability inquiry is appropriate. However, it quotes the Supreme Court's statement that "[r]eliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception," 448 U.S. at 66, 100 S.Ct. at 2539, and argues that Fed.R.Evid. 801(d)(2)(E) is just such a "firmly rooted hearsay exception." On several grounds we believe that coconspirator statements are not encompassed in the "hearsay exception[s]" to which the above quotation applies.
 
 
 70
 In the first place, coconspirator statements are not technically hearsay. The hearsay exceptions are embodied in Rules 803 and 804, and are specifically denominated as such. In contrast, the Federal Rules of Evidence categorize coconspirator statements along with admissions as "[s]tatements which are not hearsay" under Rule 801(d)(2). Thus the rule permitting their admission is not "a firmly rooted hearsay exception."
 
 
 71
 In the second place, and more significantly, the rationale for admitting evidence under the rules covering hearsay exceptions is different from that used to admit coconspirator statements. Evidence falling within the hearsay exceptions is admissible because of its special trustworthiness. See McCormick, supra, § 262, at 628; 5 Wigmore on Evidence §§ 1420, 1422. Admissions, on the other hand, are not admitted because of confidence in their inherent reliability. They are instead admitted because a party will not be heard to object that s/he is unworthy of credence. See McCormick, supra, at 628-29. As explained by the Advisory Committee, "Admissions by a party-opponent are excluded from the category of hearsay on the theory that their admissibility in evidence is the result of the adversary system rather than satisfaction of the conditions of the hearsay rule .... No guarantee of trustworthiness is required in the case of an admission." Fed.R.Evid. 801(d)(2) Notes of Advisory Committee on Proposed Rules.
 
 
 72
 Rule 801(d)(2) treats coconspirator statements as a category of party admissions. It does so because of the legal fiction that each conspirator is an agent of the other and that the statements of one can therefore be attributable to all. United States v. Trowery, 542 F.2d at 626. In effect, the Rules have adopted the agency rationale, although the framers recognized that this theory is "at best a fiction." Fed.R.Evid. 801(d)(2)(E) Notes of Advisory Committee on Proposed Rules.
 
 
 73
 If there is no assumption that a coconspirator statement is per se trustworthy, a Rule 801 inquiry cannot be viewed as necessarily equivalent to a Confrontation Clause inquiry. It must be separately ascertained whether coconspirator statements sought to be admitted are attended by adequate assurances of reliability. As the Court stated in California v. Green, 399 U.S. 149, 155, 90 S.Ct. 1930, 1933, 26 L.Ed.2d 489 (1970), the evidentiary rules and the Confrontation Clause "are generally designed to protect similar values" but the overlap is not complete. Statements which satisfy one may not satisfy the other. We cannot, as the government would have us do, abdicate our responsibility to preserve constitutional values to the rule writers, whether federal or state. On the other hand, since the Confrontation Clause is equally applicable in state trials, see Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), we must be cautious not to use the Confrontation Clause as a vehicle for imposing what are merely our evidentiary preferences on the states. In fact, the plurality opinion in Dutton which distinguished between the separate inquiries suggested that the federal evidentiary rule on coconspirator statements was more limited than required by the Confrontation Clause. See 400 U.S. at 82, 91 S.Ct. at 216.
 
 
 74
 We agree with the government that in many, if not most, instances a coconspirator statement which is admissible under Rule 801(d)(2)(E) will also be sufficiently reliable to satisfy the Confrontation Clause. See United States v. Nelson, 603 F.2d 42, 46 (8th Cir.1979) ("absent some unusual circumstance" coconspirator statements which satisfy Fed.R.Evid. 801(d)(2)(E) do not violate the Confrontation Clause). The Ninth Circuit has identified the following factors as relevant to the Confrontation Clause inquiry:
 
 
 75
 (1) whether the declaration contained assertions of past fact; (2) whether the declarant had personal knowledge of the identity and role of the participants in the crime; (3) whether it was possible that the declarant was relying upon faulty recollection; and (4) whether the circumstances under which the statements were made provided reason to believe that the declarant had misrepresented the defendant's involvement in the crime. Dutton, 400 U.S. at 88-89, 91 S.Ct. at 219-220.
 
 
 76
 United States v. Perez, 658 F.2d at 661 (footnote omitted). The court also stated that, "All four elements need not be present in order to satisfy the confrontation clause. In some circumstances, a statement may be admitted over confrontation clause objections even if it does not pass scrutiny under each prong of the Dutton test." Id.
 
 
 77
 Stillman suggests that the Confrontation Clause requires that a declarant have personal knowledge before the coconspirator statement will be admissible. Although personal knowledge is not a requirement for admission as a coconspirator statement under Rule 801(d)(2)(E), see text at II. D., supra, it cannot be disregarded in the separate though parallel analysis under the Confrontation Clause. It is, as the Ninth Circuit recognized in Perez, one of the significant, albeit not necessarily indispensable, factors which should be considered in determining whether the content and circumstances of the challenged statement bear sufficient "indicia of reliability" to vouch for its trustworthiness.
 
 
 78
 Our review of the record convinces us that the challenged evidence satisfies the "reliability" requirement of the Confrontation Clause. The out-of-court statements by Ghassan, Ibraham, and Abedeen contain numerous "indicia of reliability." They appear to have been based on first-hand knowledge, they were made under circumstances which suggest little incentive for prevarication,[16] and they were corroborated by additional evidence.
 
 
 79
 Stillman claims that DEA agent Schmotzer's testimony that McFayden told him on several occasions that he was having difficulty obtaining heroin because Ghassan was delivering it to Stillman instead was not reliable because not based on McFayden's personal knowledge. We agree that the basis for McFayden's information is unclear, but even if his statements were erroneously admitted, this did not constitute reversible error. These statements were largely duplicated by other properly admitted evidence. Rossi testified that, as they were leaving a meeting with Schmotzer and McFayden, Ghassan and Ibraham stated that they wished they had not left the heroin behind in Detroit (where they had met with Stillman) since they felt that they could make a better sale to Schmotzer. In view of this testimony, the admission of McFayden's statements could not have impermissibly prejudiced Stillman.
 
 
 80
 Accordingly, although we are cognizant that admission of coconspirator statements in a complex conspiracy trial with multiple defendants must be carefully monitored by the district court at all stages of the trial in order to avoid undue prejudice to the defendants, we find no reversible error in their admission in this case.
 
 III.
 MARITAL PRIVILEGE
 
 81
 Ghassan Ammar contends that Judith's testimony regarding conversations between them shortly after his arrest was inadmissible because it violated the marital communications privilege. Judith testified that when she visited Ghassan in jail, he told her to try to raise money for his bail and attorney's fees, if necessary, from money owed by Stillman from their heroin dealings. Judith used this testimony to support her defense that she had been unaware until these conversations that Ghassan's drug dealings had been for his own benefit rather than as part of an arrangement with the government. Ghassan contends that Judith's testimony was particularly damaging to him because it undermined his own defense that he had undertaken the acts charged in the indictment in his role of government informant.
 
 
 82
 Judith, of course, could not be denied the right to testify in her own defense. Testimony essential to a spouse's criminal defense must be permitted even if it discloses privileged communications. A severance may be granted for a co-defendant spouse, if necessary to protect his or her rights. See United States v. Fields, 458 F.2d 1194, 1198-99 (3d Cir.1972), cert. denied, 412 U.S. 927, 93 S.Ct. 2755, 37 L.Ed.2d 154 (1973).
 
 
 83
 Here, however, the district court denied the severance after concluding that the conversations were not privileged marital communications because they pertained to ongoing or future criminal activity involving both spouses. Other circuits have recognized such an exception to the marital communications privilege, on the ground that such communications are not worthy of protection. See, e.g., United States v. Price, 577 F.2d 1356, 1365 (9th Cir.1978), cert. denied, 439 U.S. 1068, 99 S.Ct. 835, 59 L.Ed.2d 33 (1979); United States v. Mendoza, 574 F.2d 1373, 1379-81 (5th Cir.), cert. denied, 439 U.S. 988, 99 S.Ct. 584, 58 L.Ed.2d 661 (1978); United States v. Kahn, 471 F.2d 191, 194-95 (7th Cir.1972), rev'd on other grounds, 415 U.S. 143, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974). We reject Ghassan's contention that our decision in Appeal of Malfitano, 633 F.2d 276 (3d Cir.1980), holds to the contrary.
 
 
 84
 In Malfitano, we held that the wife of a grand jury target could invoke the privilege against adverse spousal testimony and refuse to testify before the grand jury, even though she was allegedly involved in her husband's criminal activity. We held that marriages involving criminal activity were no less worthy than other marriages of the protection which the privilege against adverse spousal testimony was designed to provide. We were careful to emphasize, however, that we were not addressing the separate marital communications privilege, 633 F.2d at 277 n. 2, and indicated that the result under it might well be different. Id. at 279 n. 5.
 
 
 85
 The two privileges are distinct. The privilege against adverse spousal testimony, which prevents one spouse from being compelled to testify against the other, rests with the testifying spouse, who may choose to waive it. Trammel v. United States, 445 U.S. 40, 53, 100 S.Ct. 906, 913, 63 L.Ed.2d 186 (1980). This privilege, designed to protect the marriage relationship as it exists at the time of trial, "applies to all testimony of any kind." See 2 Wright & Miller, Federal Practice & Procedure 2d § 406 (1983). In contrast, the marital communications privilege prevents a testifying spouse from disclosing confidential communications between the spouses. It "reaches only those communications made in confidence and intended to be confidential." Id.
 
 
 86
 The government argues that while marriages involving criminal activity may still be worthy of protection, specific marital communications in furtherance of that criminal activity are not deserving of protection. This privilege is akin to the attorney-client privilege, also designed to protect the confidences of the communicator, which has been held not to extend to communications in furtherance of criminal activity. See Clark v. United States, 289 U.S. 1, 53 S.Ct. 465, 77 L.Ed. 993 (1933); In re Grand Jury Proceedings, 604 F.2d 798, 802 (3d Cir.1979). We join the other circuits in holding that communications between spouses pertaining to ongoing or future criminal activity, are not protected against disclosure by the privilege for confidential marital communications.
 
 
 87
 We have already concluded that the post-arrest conversations between Ghassan and Judith were in furtherance of the conspiracy. See text at pp. 252-53 supra. It follows that they were not privileged, and that it was not error to allow Judith to testify nor to refuse the severance, a decision discretionary with the trial court.[17]
 
 IV.
 JENCKS ACT
 
 88
 Appellants contend that the district court erred in failing to strike the testimony of DEA agent Schmotzer or to declare a mistrial after it was revealed that Schmotzer had destroyed the handwritten drafts of his reports. These contained, inter alia, Schmotzer's accounts of his meetings and telephone conversations with the Ammars and McFayden while Schmotzer was posing as a heroin buyer. Appellants contend their destruction violated the Jencks Act, 18 U.S.C. § 3500, which requires that "statements" of a government witness relating to the subject matter of his testimony be produced by the government upon motion of the defendant.
 
 
 89
 In analyzing this issue, it is important to distinguish between three categories of documents: (1) contemporaneous rough notes taken by a government agent of meetings, conversations, or interviews during the course of his or her investigation; (2) the agent's subsequently prepared drafts of his reports of these incidents; and (3) the final report signed by the agent. In United States v. Vella, 562 F.2d 275, 276 (3d Cir.1977) (per curiam), we held with regard to the first category that "the rough interview notes of F.B.I. agents should be kept and produced so that the trial court can determine whether the notes should be made available to the [defendant] under the rule in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) [requiring disclosure of exculpatory evidence] or the Jencks Act." Accord United States v. Parker, 549 F.2d 1217, 1223-25 (9th Cir.), cert. denied, 430 U.S. 971, 97 S.Ct. 1659, 52 L.Ed.2d 365 (1977); United States v. Harrison, 524 F.2d 421, 428-29 (D.C.Cir.1975). But see United States v. Martin, 565 F.2d 362, 363 (5th Cir.1978); United States v. McCallie, 554 F.2d 770, 773 (6th Cir.1977). No question under Vella arises here. Schmotzer taped some of the conversations, had only rough notes of others, and had no contemporaneous record of still others. The tape recordings were made available to appellants and were played at trial. The rough notes of the conversations were turned over to the defendants. The final typed, signed reports were also made available to defendants.
 
 
 90
 The issue in this case is thus confined to the second category of materials referred to above. Appellants claim they were entitled to the handwritten drafts of Schmotzer's reports, on the theory that some of those were the most nearly contemporaneous record of the events at issue.
 
 
 91
 Under the Jencks Act the government must produce written statements made by a witness which are "signed or otherwise adopted or approved by him." 18 U.S.C. § 3500(e)(1). Ordinarily rough drafts of an agent's report which are subsequently typed verbatim would not be a producible "statement." See United States v. Kaiser, 660 F.2d 724, 731-32 (9th Cir.1981). On the other hand, in our Walden decisions, we recognized that a report draft which "was at least in a form sufficiently acceptable to the agent that he allowed it to be reviewed by his superior" might have been "adopted or approved" by the agent and hence fall within the Jencks Act. United States v. Walden, 578 F.2d 966, 970 (3d Cir.1978) (Walden I ), on remand, 465 F.Supp. 255 (E.D.Pa.1978), aff'd, 590 F.2d 85 (3d Cir.) (Walden II ) (per curiam), cert. denied, 444 U.S. 849, 100 S.Ct. 99, 62 L.Ed.2d 64 (1979).[18]
 
 
 92
 Although in most cases a rough draft may not be a Jencks Act "statement," we believe the same rationale which underlay our decision in Vella directing retention of rough notes is also applicable to handwritten drafts of agents' reports. We therefore hold that, hereafter, the government must retain and, upon motion, make available to the district court both the rough notes and the drafts of reports of its agents to facilitate the district court's determination whether they should be produced. This requirement should impose no undue burden on the government.[19]
 
 
 93
 In this case, unlike Walden, the handwritten drafts were not shown to Schmotzer's supervisor. Thus, there would have been no basis to find that Schmotzer had "adopted or approved" them, a predicate to the Walden finding that the handwritten drafts were "statements" under the Jencks Act.
 
 
 94
 Furthermore, Schmotzer testified that he compared the typewritten reports with the handwritten drafts and determined that they were substantially identical before he destroyed the handwritten drafts. There is no basis for concluding that the destruction was in bad faith. Thus, even were these drafts Jencks Act material, their destruction would have constituted harmless error. See United States v. Roemer, 703 F.2d 805, 807 (5th Cir.1983); Walden II, 590 F.2d at 86; United States v. Vella, 562 F.2d at 276.
 
 
 95
 We do not read our decision in Walden II as requiring testimony beyond that of the agent that the handwritten drafts and typed reports were identical, as the district court suggested in United States v. Butts, 535 F.Supp. 608, 611-15 (E.D.Pa.1982). While such additional testimony may be helpful in making the Jencks Act determination, we did not mean to suggest that independent corroboration is a necessary requirement for a finding of harmless error. Nonetheless, the government must be vigilant in observing its responsibility to preserve these materials because the Supreme Court has cautioned that "the harmless error doctrine must be strictly applied in Jencks Act cases." Goldberg v. United States, 425 U.S. 94, 111 n. 21, 96 S.Ct. 1338, 1348 n. 21, 47 L.Ed.2d 603 (1976).
 
 
 96
 We therefore conclude that the district court did not err in refusing to strike agent Schmotzer's testimony or to declare a mistrial based on alleged Jencks Act violations.
 
 V.
 SIXTH AMENDMENT CLAIM
 
 97
 Judith Ammar contends that Welkie should not have been permitted to testify regarding his conversation with her on September 19, 1980. At that time, Welkie was cooperating with the government, and the government was aware that Judith was standing on her Fifth Amendment right to remain silent with respect to all questions regarding her involvement in the drug activities since she had appeared with counsel before the grand jury investigating Ghassan on August 28, 1980 and declined to testify. Judith asserts that the September 19 conversation was an effort by the government to deliberately elicit incriminating statements from her, in violation of her Sixth Amendment rights as established in Massiah v. United States, 377 U.S. 201, 206, 84 S.Ct. 1199, 1203, 12 L.Ed.2d 246 (1964), and United States v. Henry, 447 U.S. 264, 273, 100 S.Ct. 2183, 2188, 65 L.Ed.2d 115 (1980). However, at the time of the September 19, 1980 conversation, Judith had not yet been indicted. Therefore, the Massiah--Henry principles do not apply. See United States v. Hamilton, 689 F.2d 1262, 1275 (6th Cir.1982), cert. denied, --- U.S. ----, 103 S.Ct. 753, 74 L.Ed.2d 971 (1983); United States v. Hollingshead, 672 F.2d 751, 755 (9th Cir.1982); see also Hoffa v. United States, 385 U.S. 293, 309-10, 87 S.Ct. 408, 417, 17 L.Ed.2d 374 (1966).
 
 
 98
 In Massiah, the Court held that a defendant's right to counsel was violated by the introduction at trial of statements he made to his co-defendant, who was at the time acting as an agent of the government. Similarly, in Henry the Court held that the government's use of defendant's cellmate to report incriminating statements made by defendant during their conversations violated the defendant's Sixth Amendment rights, notwithstanding the fact that the informer had been instructed not to initiate any questioning. In both Massiah and Henry, the challenged conversations occurred after the defendant's indictment. Indeed, the Henry Court stated that: "It is quite a different matter when the Government uses undercover agents to obtain incriminating statements from persons not in custody but suspected of criminal activity prior to the time charges are filed." 447 U.S. at 272, 100 S.Ct. at 2187. While the Court stated that it is not necessary that the defendant be actually in "custody" for the rule of Massiah and Henry to apply, id. at 273-74 n. 11, 100 S.Ct. at 2188 n. 11, it has also made clear that the Sixth Amendment right to counsel is not triggered until some action is taken constituting the initiation of criminal proceedings against the defendant. See Brewer v. Williams, 430 U.S. 387, 398-99, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424 (1977); Kirby v. Illinois, 406 U.S. 682, 688, 92 S.Ct. 1877, 1881, 32 L.Ed.2d 411 (1972). We view the government's conduct regarding the September 19, 1980 conversation to be of questionable propriety, but we believe it is clear from the Supreme Court's statements that the Sixth Amendment right to counsel, as enunciated in Massiah and Henry, does not extend to the pre-indictment period.
 
 VI.
 CHEMISTRY ISSUES
 
 99
 Appellants raise what Stillman has denominated as chemistry issues. They suggest, somewhat opaquely, (1) that the substance in evidence which formed the basis for the indictments was not proven to be heroin, and (2) that even if it were heroin, it may not have been a narcotic.
 
 A.
 IDENTIFICATION OF THE HEROIN
 
 100
 Appellants were convicted on two conspiracy counts as well as a number of substantive counts involving importation and distribution of "heroin, a Schedule I narcotic substance." The schedules of controlled substances are set forth in 21 U.S.C. § 812, and are listed in 21 C.F.R. § 1308.11. The Schedule I substances are drugs or other substances which have "a high potential for abuse", "no currently accepted medical use in treatment in the United States", and as to which "there is a lack of accepted safety for use of the drug or other use under medical supervision." 21 U.S.C. § 812(b)(1). Heroin is listed as a Schedule I drug.[20]
 
 
 101
 At the trial, the government introduced samples of the substance in question and presented three expert witnesses, each of whom testified that he had tested one or more of the samples and had concluded that the substance was heroin. Roger Godino, a forensic chemist who worked for the Drug Enforcement Administration for ten years and analyzed approximately 5,000 exhibits of controlled substances in that time, reached the conclusion that the substance was heroin after subjecting it to various tests. He ran at least three different color tests, performed a thin layer chromatography test, did a gas chromatographic analysis, and performed an infrared spectrum analysis. He testified that the most specific test for purposes of identification of heroin was the infrared analysis, and that he used accepted techniques in comparing the infrared spectrum of the specimen with his standard spectrum for heroin. He concluded unequivocally that the substance in question was heroin.
 
 
 102
 Similar tests were run by the other two government chemists, each of whom reached the same conclusion. Alexander Stirton, an employee of the Pennsylvania State Police with eight years experience in analyzing controlled substances, testified that he subjected the substance submitted to him to color tests and infrared spectrum analysis, and concluded that it was heroin. George Yamnitzky, a chemist with the Drug Enforcement Administration who had analyzed approximately 1,000 specimens of controlled substances, subjected the samples to color tests, ultraviolet fluorescence analysis, thin layer chromatography, and mass spectrometry. He stated that he used the mass spectrometer in preference to an infrared spectrophotometer because of the nature of the specimens. Based on his tests, he concluded that the substance was heroin.
 
 
 103
 Stillman introduced the testimony of his expert, Dr. Robert Shapiro, who testified primarily on general chemical principles. Dr. Shapiro challenged the conclusion of the government experts that the substance was heroin, testifying that the results reached by the government chemists were outside of the ranges for heroin reported in standard chemical literature. He conceded, however, that the best method of analysis was to use the spectrum comparison method employed by the government chemists. As Godino testified, it was his preferred practice to compare the spectrum of the questioned substance against a spectrum of known heroin previously obtained by him using the same instrument and under the same conditions, rather than to compare it with a standard spectrum found in a reference book. Tr. 889-90. Significantly, Dr. Shapiro did not analyze the substance in question himself and defendants have conceded that they could have, but did not, conduct such an examination.[21]
 
 
 104
 The court instructed the jury that it must determine, beyond a reasonable doubt, that the substance was heroin or any isomer of heroin.[22] The court refused to give the instruction proffered by Stillman that "[o]nly the optical isomers of heroin are included." The court characterized Stillman's instruction as "argumentative, lengthy and ... confusing to the jury." On appeal Stillman claims that the failure to so instruct the jury was reversible error.
 
 
 105
 To understand Stillman's argument, it is necessary to distinguish between isomers generally and optical isomers, which are a type of isomer. Isomers are substances with the same chemical composition but different structural arrangement. The number of isomers a substance may theoretically have is a function of the complexity of its chemical formula. Because heroin has a complex chemical formula, C sub21 H sub23 NO sub5 , the many constituent atoms could be arranged in a large variety of different structures. While that theoretical possibility may be of experimental interest, defendants presented no evidence that it did or could have any practical significance in this case.
 
 
 106
 Under the statute, Schedule I controlled substances are defined to include the isomers of enumerated substances. The Code of Federal Regulations defines "isomer" as "the optical isomer" for all but specified substances. 21 C.F.R. § 1308.02(c). Optical isomers, so termed because they rotate a beam of polarized light, are the mirror image of each other. We do not understand the government to dispute Stillman's claim that heroin as referred to in Schedule I of the criminal statute is limited to heroin or its optical isomer. Instead, it is the government's claim that because its evidence conclusively showed that the substance was heroin within the more restrictive meaning, appellants were in no way harmed by the court's refusal to give the instructions they requested.
 
 
 107
 In what may have been an attempt to befuddle the issue, the defendants cross-examined the government's experts on other substances such as pseudoheroin, isoheroin and transheroin, purportedly isomers of heroin, and suggested by inference that the government experts were unable to exclude the possibility that the substances examined in this case might have in fact been one of those compounds. However, Yamnitsky, a government expert, testified that the mass spectra he obtained showed that the substance was heroin, and not either isoheroin or pseudoheroin. Tr. 1961-62. Significantly, the defendant's expert never testified that the test results in this case demonstrated or even indicated that the substance was isoheroin, pseudoheroin, or transheroin, substances which, even if they have been created, have been so only under experimental laboratory conditions. In fact, there is no evidence that transheroin has been created at all. It may be that the defendants mentioned these substances in their cross-examination merely because they happen to contain the word "heroin." The government's expert Godino specifically stated that "isoheroin, pseudoheroin, and transheroin, that is not a form of heroin. Even though it says the word heroin in it. It is a little misleading, especially to people that are not familiar ... with the literature." Tr. 895.
 
 
 108
 The district court instructed the jury on the only issue put into dispute by the evidence, whether the substance was heroin. It was not obliged to instruct the jury with regard to hypothetical possibilities when there was no basis in the evidence to support such possibilities. See United States v. Conroy, 589 F.2d 1258, 1273 (5th Cir.), cert. denied, 444 U.S. 831, 100 S.Ct. 60, 62 L.Ed.2d 40 (1979). Indeed, in his closing argument, Stillman's attorney attacked the data obtained by the government's chemists, but expressly stated, "Let us be certain of what we understand. I am not at this point arguing to the jury that those exhibits are not heroin." Tr. March 4, 1981 (summations), at 82. We believe, therefore, that whether or not there was a technical error in the court's instructions, the refinement requested by Stillman merely eliminated possibilities that were already definitively eliminated by the government's witnesses, and that there was a valid basis in the evidence for the jury's conclusion that the substance was heroin within Schedule I.
 
 B.
 THE SUBSTANCE AS A NARCOTIC
 
 109
 Stillman further contends that even if the government proved that the substance in the exhibits was heroin, and thus a Schedule I substance, the government failed to show that this substance was a narcotic. The statute differentiates in penalty between crimes involving Schedule I substances which are narcotics and those which are non-narcotics. It imposes a 15 year penalty in the case of a controlled substance in Schedule I which is a narcotic drug, see 21 U.S.C. § 841(b)(1)(A), but only a 5 year penalty in the case of a controlled substance in Schedule I which is not a narcotic drug, see 21 U.S.C. § 841(b)(1)(B).
 
 
 110
 Stillman argues that because heroin has an optical isomer (or enantiomer), which the government concedes, the government was obliged to negate the possibility that the substance in this case was the optical isomer of heroin. Heroin is an opium derivative. Opium, which is found in a naturally growing plant, contains morphine which can be modified to yield heroin. The product of this process is L-heroin, so named because it rotates polarized light to the left. Heroin made from natural morphine is always L-heroin. Its optical isomer would be D-heroin (sometimes referred to as R-heroin), and would have to be created from synthetic morphine.
 
 
 111
 Stillman apparently argues that if the substance were D-heroin, it would not be a narcotic and hence not subject to the 15 year penalty. Admittedly, none of the government experts conducted any tests on the substance to determine if it was D-heroin. The government responds that such a test was unnecessary because the statute defines "narcotic" as including "opium derivatives" and heroin is listed as an opium derivative without distinguishing between L- and D-heroin. See Verdugo v. United States, 402 F.2d 599, 607 (9th Cir.1968), cert. denied, 402 U.S. 961, 91 S.Ct. 1623, 29 L.Ed.2d 124 (1971) (stating that heroin is a narcotic drug as a matter of law). Notwithstanding differences between D-heroin and L-heroin, Congress is free to define them both as narcotics.
 
 
 112
 The district court was not required to charge the jury with respect to the possibility that the substance was D-heroin. In the first place, neither the statute nor the Code of Federal Regulations distinguishes between L-heroin and D-heroin. Furthermore, no witness testified that there was any reasonable likelihood that the substance in question was D-heroin. As the government witnesses testified, while theoretically possible, it would be extremely expensive to manufacture heroin synthetically. Defendant's witness, Dr. Shapiro, did not testify that there was any D-heroin available. He did testify that synthetic morphine, from which D-heroin could theoretically be derived, had been produced under university laboratory conditions, but he gave no indication whether the amounts produced were significant. Moreover, he stated that heroin derived from synthetic morphine would not necessarily be D-heroin, and that in the laboratory examples he knew of the heroin produced had in fact been an equal mixture of L-heroin and D-heroin. Tr. 4184-85.
 
 
 113
 We believe that the language of the Ninth Circuit in United States v. Hall, 552 F.2d 273, 276 (9th Cir.1977), where the court held that the evidence was sufficient to support defendant's conviction notwithstanding the government's failure to test the cocaine in question to determine whether it was L-cocaine or D-cocaine, is equally relevant here:
 
 
 114
 [The government's expert] testified that his tests indicated that the substance was cocaine. In addition, while [his] tests could not distinguish between the isomers of cocaine, there was extensive circumstantial evidence showing that the substance was natural cocaine derived from coca leaves (l-cocaine) rather than d-cocaine. The government presented evidence that d-cocaine was difficult and expensive to make. More importantly, the experts had never actually found a specimen of d-cocaine. Finally, d-cocaine could be synthesized anywhere, according to the experts, yet instead of basing his operations in the interior United States, there was evidence that [defendant] was engaged in a smuggling operation to bring drugs into the United States from Mexico. This evidence, with reasonable inferences drawn therefrom, is more than adequate to permit a rational conclusion by the jury that the substance sold by [defendant] was, beyond a reasonable doubt, cocaine.
 
 
 115
 Once again, we believe that the district court was not obliged to instruct the jury on a hypothetical possibility without the support of evidence in the record and agree with the district court that such an instruction would have been both misleading and confusing.
 
 VII.
 CONCLUSION
 
 116
 As the Supreme Court has recently stated, "there can be no such thing as an error-free perfect trial." United States v. Hasting, --- U.S. ----, 103 S.Ct. 1974, 76 L.Ed.2d 96 (U.S.1983). This is particularly true when, as here, the trial is long and there are multiple defendants with multiple objections. Our task as a reviewing court is to review "the trial record as a whole." In view of the exceedingly large number of issues raised on appeal, we have reviewed all aspects of this record. We conclude that there was no prejudicial error on any issue raised by appellants, and that they received the fair trial to which they are entitled. Accordingly, we will affirm the judgments of conviction.
 
 APPENDIX
 
 117
 [Taken verbatim from Appellants' Briefs]
 
 I.
 The Ammars' Contentions
 
 118
 Whether the Court erred in denying Ghassan's theory of the case instruction.
 
 
 119
 Whether the Court below committed prejudicial error in failing to charge, even though requested, that the jury must find that the controlled substance which was the subject matter of the conspiracy and importation charges was, in fact, heroin within the definition of the Code of Federal Regulations before the jury could convict the Defendant and whether the Court committed prejudicial error in failing to submit a charge on the lesser included offense set forth in 21 U.S.C. § 841(b)(1)(A).
 
 
 120
 Whether it was error to deny the Ammars' Motion to Sever and Request for Relief from Prejudicial Misjoinder under Rules 14 and 8(a) and (b) of the Federal Rules of Criminal Procedure; whether it was error to deny the Ammars' Motion to Strike overt acts numbered 50-56 from the indictment.
 
 
 121
 Whether the Court erred in permitting Judith to testify as to confidential communications not in furtherance of any conspiracy between herself and Ghassan occurring after his arrest on August 1, 1980 and in failing to grant the Ammar's related Motions for Severance.
 
 
 122
 Whether the trial Court committed prejudicial error in failing to grant, even though requested, a hearing pursuant to Rule 104 of the Federal Rules of Evidence and in accordance with the holding of United States v. James, 590 F.2d 575 (5th Cir.1979) to determine the admissibility of out of court statements made by co-conspirators and then, thereafter, committed prejudicial error in failing to apply the proper standard as to the admissibility of those statements.
 
 
 123
 Whether the trial Court erred in failing to fashion an appropriate remedy after it was learned that the case agent had destroyed his handwritten reports.
 
 
 124
 Whether the trial Court committed prejudicial error in failing to suppress the evidence regarding Judith Ammar's September 19, 1980 tape recorded conference with John Welkie when the D.E.A. obtained the statement and specifically knew that "(1) Welkie was entering her home as a paid confidential informer with a secret microphone; (2) that Judith Ammar was represented by counsel and (3) that counsel had specifically advised the Government, that other than discussing the activities of the Ammar Trading Service, she was standing on her Fifth Amendment right to remain silent with respect to all questions regarding her involvement in these drug activities.
 
 
 125
 Whether the Court below committed reversible error in failing to allow proof, by way of expert testimony, that critical statements attributed to Judith Ammar in the September 19, 1980 tape recorded conversation with John Welkie did not occur.
 
 
 126
 Whether the Court below committed prejudicial error in failing to grant Judith Ammar's Motion to Dismiss the Grand Jury Indictment, or at the very least, conduct a hearing out of the presence of the jury once there was threshold evidence to establish that her indictment was the product of false testimony of John Welkie, a paid confidential informer for the D.E.A.
 
 II.
 Stillman's Contentions
 
 127
 Was the defendant denied a fair trial, due process of law and his right of confrontation when the trial court took the following actions with respect to the testimony of the Government's critical witness:
 
 
 128
 Denied defendant access to statements of the witness given to his probation officer and refused to examine the statements in camera for impeachment material?
 
 
 129
 Quashed defendant's subpoena for letters written by the witness?
 
 
 130
 Refused to permit defendant to question whether the witness's plea bargain included an agreement not to bring other charges?
 
 
 131
 Refused to permit defendant to question whether the plea bargain included an agreement not to prosecute for income tax evasion?
 
 
 132
 Refused to require the witness to submit to psychological examination to determine the extent of memory impairment caused by heroin addiction?
 
 
 133
 Refused to grant use immunity to a co-defendant whose testimony would contradict that of the witness concerning the single directly incriminatory event?
 
 
 134
 Refused to permit cross-examination based upon interview notes taken by a DEA agent?
 
 
 135
 Refused to allow cross-examination over the government's inclusion of its right to a polygraph examination upon demand in the witness's plea bargain?
 
 
 136
 Denied defendant access to DEA files on the informer-witness, refused to examine their contents in camera for impeachment material and other exculpatory evidence, and refused to seal them for transmittal to this Court?
 
 
 137
 Upheld an assertion of "governmental privilege" against disclosure of the DEA file on the witness by an Assistant United States Attorney?
 
 
 138
 Denied defendant access to interview notes of an Assistant United States Attorney of an interview immediately before the witness changed his version to an incriminatory one?
 
 
 139
 Refused to instruct the jury in accordance with the testimony of an expert that the witness's addiction to heroin might be considered in assessing his memory?
 
 
 140
 Was the defendant denied a fair trial, due process of law and his right of confrontation when the trial court took the following actions with respect to out-of-court declarations of alleged conspirators:
 
 
 141
 Refused to conduct a pretrial hearing to determine whether statement of an alleged conspirator were admissible within Fed.R.Evid. 801(d)(2)(E)?
 
 
 142
 Refused to conduct a pretrial hearing to determine whether statements of an alleged conspirator were made in his role as government informer?
 
 
 143
 Refused to apply a preponderance of the evidence standard in assessing the admissibility of statements of alleged conspirators and instead applied a prima facie standard?
 
 
 144
 Refused to exclude statements of alleged conspirators which were narrative and not in furtherance of any charged conspiracy?
 
 
 145
 Refused to exclude statements of alleged conspirators which were made after the conspiracies charged had terminated?
 
 
 146
 Required the jury to determine whether statements were in furtherance of a conspiracy and during its pendency and refused to submit instructions which defined these terms?
 
 
 147
 Refused to allow defendant to make an opening statement before the introduction of evidence in which the jury would be cautioned that out-of-court statements by an alleged conspirator might have been made in his role of undercover informer?
 
 
 148
 Refused to exclude out-of-court statements which were neither reliable, trustworthy nor corroborated?
 
 
 149
 Refused to instruct the jury that out-of-court statements should be considered with caution?
 
 
 150
 Refused to exclude out-of-court declarations when there was no evidence that the declarant had personal knowledge of the facts asserted?
 
 
 151
 Refused to instruct the jury that out-of-court declarations by an alleged conspirator were not evidence against defendant if made while the declarant was acting as an undercover informer and not as a conspirator?
 
 
 152
 Refused to allow evidence that the declarant of out-of-court statements had previously been convicted of a felony and had a bad reputation for truthfulness?
 
 
 153
 Instructed the jury that it could not consider the testimony of alleged conspirators in determining a defendant's membership in the conspiracy?
 
 
 154
 Refused to instruct the jury that statements by an alleged conspirator were conceded to be false?
 
 
 155
 Allowed the jury to consider adoptive admissions of an alleged conspirator as statements in furtherance of conspiracy?
 
 
 156
 Refused to allow cross-examination of an alleged conspirator over privileged conversations with another alleged conspirator?
 
 
 157
 Submitted to the jury the determination of which conversations of an alleged conspirator should be excluded as within the marital privilege?
 
 
 158
 Was the defendant denied a fair trial and due process of law when the trial court made the following rulings:
 
 
 159
 Admitted evidence of the non-testifying defendant's four-year-old conviction for use of a telephone to facilitate the purchase of heroin on the theory that both that offense and the instant conspiracies were "identical" in the sense that a telephone was used in the commission of both crimes?
 
 
 160
 Refused to conduct a hearing on whether the probative value of defendant's prior conviction outweighed its prejudicial effect?
 
 
 161
 Refused to allow defendant to testify to the circumstances of the prior conviction and his reasons for entering an Alford plea to that charge without being cross-examined on the merits of the case on trial?
 
 
 162
 Refused to grant a continuance to permit defendant to obtain evidence which would contradict testimony of a DEA agent who testified to the prior conviction on the grounds that the testimony was collateral?
 
 
 163
 Refused to instruct the jury on the significance of multiple conspiracies and that it must acquit the defendant if he was found to be a member only of a conspiracy not charged in the indictment?
 
 
 164
 Submitted an instruction which allowed the jury to convict defendant for a conspiracy not charged in the indictment?
 
 
 165
 Held that where the Code of Federal Regulations placed a limiting construction on a penal statute, the defendant could be convicted if his conduct was within the statute even though it was excluded by the Code?
 
 
 166
 Refused to submit an instruction which defined the elements of the offense?
 
 
 167
 Refused to submit a lesser-included offense when the evidence demonstrated its existence and possible commission?
 
 
 168
 Denied defendant's motion for mistrial after it had informed the jury that a person to whom heroin was delivered was an "agent" of defendant?
 
 
 169
 Instructed the jury that pleas of guilty by alleged conspirators were not "necessarily" evidence of defendant's guilt?
 
 
 170
 Instructed the jury that evidence of a defendant's prior conviction could be used in weighing his credibility when the convicted defendant did not testify?
 
 
 171
 BECKER, Circuit Judge, concurring.
 
 
 172
 I join without reservation in all portions of Judge Sloviter's opinion except for Parts II.A.1. and II.A.2. In Part II.A.1., Judge Sloviter's follows our opinion in United States v. Continental Group, Inc., 603 F.2d 444 (3d Cir.1979), cert. denied, 444 U.S. 1032, 100 S.Ct. 703, 62 L.Ed.2d 668 (1980), and holds that the district court was not required to hold an in limine hearing to determine the sufficiency of nonhearsay evidence ("evidence aliunde ") to establish a conspiracy and connect a defendant to it. In Part II.A.2., also following Continental Group, Judge Sloviter holds that the district court was not required to make explicit its conclusion that there was a preponderance of evidence aliunde because that conclusion could be inferred from the court's decision to submit the case to the jury.
 
 
 173
 These holdings relate to the trial judge's evidentiary screening function, now codified in Fed.R.Evid. 104(a). Rule 104(a) allocates the determination of preliminary questions concerning the admissibility of evidence to the court. Proper performance of that screening function is essential to the fair conduct of conspiracy trials, especially of complex, multi-count conspiracy indictments. Because this panel is bound by our holding in Continental Group, I concur in the result in Parts II.A.1. and II.A.2. I write separately, however, to express my belief that the Continental Group rule sweeps too broadly. In my view, this Court should no longer be content to infer a finding of sufficient evidence aliunde from the district court's decision to submit the case to the jury, at least where that finding requires the resolution of credibility questions. Moreover, I believe that this Court should counsel the district courts that in limine hearings, while not required, are at least preferred in cases where the defendant wishes to attack the credibility of a witness whose credibility is critical to the court's evidentiary determination and the circumstances of the trial itself (typically a multi-count, multi-defendant conspiracy trial) impairs that strategy.I.
 
 
 174
 To understand the screening function of the trial judge, it is helpful to refer to Judge Friendly's opinion in United States v. Geaney, 417 F.2d 1116 (2d Cir.1969), cert. denied, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970), which was adopted by this Court in United States v. Bey, 437 F.2d 188 (3d Cir.1971), and its progeny, including Continental Group. Judge Friendly started with the proposition established in a number of opinions by Judge Learned Hand[1] "that it was for the judge to determine whether there was sufficient evidence that the defendant against whom [co-conspirator] declarations were offered had engaged in a 'concerted mutual venture' with the declarant." Id. at 1119. Then, noting that Judge Hand's opinions left in doubt the quantum of evidence that would suffice, Judge Friendly observed:
 
 
 175
 The circumstance that in a conspiracy trial the preliminary issue on the admissibility of evidence coincides with the ultimate one of the defendant's guilt should not cause the trial judge to abdicate his traditional duty to decide those issues of fact which determine the applicability of a technical exclusionary rule. When the matter is viewed from the standpoint of the trial judge, it may be hard to say more than that he must satisfy himself of the defendant's participation in a conspiracy on the basis of the non-hearsay evidence.... Setting the standard that high avoids the risk that the requirement of independent evidence will be rendered "virtually meaningless," as some courts are said to have done.
 
 
 176
 Id. at 1120 (citations omitted).
 
 
 177
 After observing that the practicalities of a conspiracy trial might require hearsay to be admitted "subject to connection," Judge Friendly announced the rule that we have followed:
 
 
 178
 [T]he judge must determine, when all the evidence is in, whether in his view the prosecution has proved participation in the conspiracy, by the defendant against whom the hearsay is offered, by a fair preponderance of the evidence independent of the hearsay utterances. If it has, the utterances go to the jury for them to consider along with all the other evidence in determining whether they are convinced of defendant's guilt beyond a reasonable doubt. If it has not, the judge must instruct the jury to disregard the hearsay or, when this was so large a proportion of the proof as to render a cautionary instruction of doubtful utility, ... declare a mistrial if the defendant asks for it.
 
 
 179
 Id. (footnote omitted).
 
 
 180
 Thus, the Geaney/Continental Group rule imposes upon the trial judge an evidentiary screening function that is essential to the fairness of the trial. What is sometimes overlooked in the rule's formal recitation, however, is that the preponderance finding differs from the prima facie test it replaces:[2] The preponderance test requires the judge to determine the credibility of witnesses and to make a finding based on a fair assessment of the evidence, whereas the credibility of witnesses need not be considered under the prima facie test. The Geaney/Continental Group rule establishes that the court is to apply a preponderance test, rather than a reasonable doubt standard, in finding that a conspiracy exists and that a defendant is connected to it. Judge Weinstein thinks that this test is not stringent enough.[3] This Court has eschewed a reasonable doubt standard, and it has rejected Judge Weinstein's position (adopted only by the Sixth Circuit, see United States v. Vinson, 606 F.2d 149 (6th Cir.1979), cert. denied, 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980)) that the trial judge should consider the hearsay testimony in making the threshold determination. However, precisely the concerns articulated by Judge Weinstein suggest that the preponderance standard be applied rigorously, with explicit findings by the district court both on the credibility of nonhearsay witnesses and the sufficiency of the evidence.
 
 
 181
 My concern on this record is with the case against appellant Stillman. The critical evidence aliunde as to Stillman's participation in the conspiracy was the testimony of Mr. Welkie, a co-conspirator turned government informant. It was Welkie who supplied the testimony about the crucial transaction linking Stillman to the conspiracy (i.e., the meeting in July 1980 at the Detroit Hyatt Regency, involving Ghassan, Dahabi, Welkie, Stillman, and an unidentified man, where, according to Welkie, Stillman directed him to give a package containing heroin to the unidentified man).
 
 
 182
 Stillman mounted a considerable attack on Welkie's credibility. He attempted to establish that Welkie had used more than two grams of heroin before and during the meeting at the Hyatt. He also attempted to show that Welkie had given fatally inconsistent statements about that meeting, having asserted in his statement to Agent Schmotzer that it had been Ghassan, not Stillman, who had directed that the package be given to the unidentified man. Stillman sought to attack Welkie's credibility on other grounds as well.[4] The district court excluded much of the proffered impeachment. And yet, despite the centrality of Welkie's credibility to the preponderance determination, the district court made no explicit credibility findings.
 
 
 183
 It seems to me that the district court misapprehended the scope of its screening responsibilities. The majority concedes that "cross-examination of Welkie was limited in some respects" but asserts that "any additional cross-examination by Stillman would have been merely cumulative." Ante. I am doubtful of that proposition, see supra note 4, but more important, it is unclear that the district court assessed Welkie's credibility on the evidence presented. The majority refuses to "assume that the [district] court ignored a portion of the evidence before it simply because its ultimate determination was unfavorable to the appellant." Ante. In my view, this Court should not be forced to infer from an ultimate conclusion that the district court properly considered evidence in performing its screening function. I would modify Continental Group to require explicit findings, at least where credibility is important to the evidence aliunde determination. We do not permit implied findings in bench trials under Fed.R.Civ.P. 52(a), and there is no reason for a different rule for a critical phase of a criminal case, as the preponderance determination under Rule 104(a) clearly is.
 
 II.
 
 184
 I turn to the procedural setting in which the credibility issues must be tested. If, as the preponderance test requires, evidentiary findings are to be made rationally and fairly in cases where credibility is at issue, the judge must allow adequate opportunity for impeachment of the persons or documents supplying evidence aliunde. And yet in a multi-count, multi-defendant conspiracy trial, with a jury in the box, the circumstances may not permit that opportunity. I recognize that Judge Sloviter, either in the text of her opinion or by her disposition of the myriad claims alleged by Stillman and catalogued in the opinion's appendix, has rejected the contention that the district court erred in excluding the proffered impeachment evidence. It is indisputable that the district court has broad discretion to exclude probative evidence on the basis of the factors listed in Fed.R.Evid. 403, including unfair prejudice to co-defendants. In my view, however, the inquiry does not end with the conclusion that the district court did not abuse its discretion by its evidentiary rulings.
 
 
 185
 Under Fed.R.Evid. 104(a), a court "is not bound by the Rules of Evidence except those with respect to privileges" in determining the admissibility of evidence. One reason for the in limine hearing procedure is to enable the court to consider evidence bearing upon the preponderance finding but not admissible at trial. In limine hearings thus give the court the ability to conduct a hearing out of the jury's presence on the threshold question whether there is a preponderance of evidence aliunde linking a particular defendant with a conspiracy, without prejudicing either him or his codefendants.
 
 
 186
 In limine hearings are flexible; they need not be full-dress, pretrial reviews of the evidence.[5] For example, it generally causes little disruption or loss of time for the trial judge to recess the trial and take sufficient testimony out of the hearing of the jury to complete the record.
 
 
 187
 I do not suggest that Rule 104(a) requires the district court to receive inadmissible evidence. That rule makes it clear, however, that a court conducting an in limine hearing is not bound by the Rules of Evidence and may consider inadmissible evidence in making its determination. Indeed, the district court might well have allowed Stillman to develop his excluded impeachment evidence in this case if our prior opinions had instructed that it is preferable for a court to hold an in limine hearing when there is a serious credibility problem in connection with an evidence aliunde determination, or when proffered impeachment evidence might unduly prejudice a co-defendant. As I have noted, multi-count, multi-defendant conspiracy trials often impair a defendant's impeachment strategy. The district court here should have had the impetus from this Court to at least consider an in limine hearing, and I believe that this Court should counsel the district courts that this is the preferred course in such situations. I would not make it an absolute requirement; I am satisfied with the wise exercise of discretion by the district courts in this Circuit.
 
 III.
 
 188
 In sum, the proceedings in this case would have been fairer to Stillman if the district court had recessed to conduct an in limine hearing to further explore Welkie's credibility. Moreover, the integrity of that exploration would have improved markedly if the district court had been required by decisions of this Court to make explicit findings. I believe that this Court, in the interest of improving the administration of justice in this Circuit, should modify the Continental Group rule accordingly.
 
 SUR PETITION FOR REHEARING
 
 189
 Before SEITZ, Chief Judge, and ALDISERT, ADAMS, GIBBONS, HUNTER, WEIS, GARTH, HIGGINBOTHAM, SLOVITER and BECKER, Circuit Judges.
 
 
 190
 The petition for rehearing filed by Appellant, Marshall Stillman, in the above entitled case having been submitted to the judges who participated in the decision of this court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied. Because Judge Becker believes that United States v. Continental Group, Inc., 603 F.2d 444, 457 (3d Cir.1979), cert. denied, 444 U.S. 1032, 100 S.Ct. 703, 62 L.Ed.2d 668 (1980), should be reconsidered by the in banc court, he would grant rehearing .
 
 
 
 [1]
 Appellant McFayden has not filed a brief in this court, but instead has informed us that he relies on the arguments presented by his co-appellants. Our rejection of those arguments thus applies to McFayden as well
 
 
 [2]
 Fed.R.Evid. 801(d)(2)(E) provides:
 (d) Statements which are not hearsay. A statement is not hearsay if--
 * * *
 (2) Admission by party-opponent. The statement is offered against a party and is ... (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.
 
 
 [3]
 The need for independent evidence was enunciated in Glasser v. United States, 315 U.S. 60, 74-75, 62 S.Ct. 457, 467, 86 L.Ed. 680 (1942), where the Court stated that coconspirator declarations "are admissible over the objection of an alleged conspirator, who was not present when they were made, only if there is proof aliunde that he is connected with the conspiracy" because otherwise "hearsay would lift itself by its own bootstraps to the level of competent evidence." Some courts have questioned whether Glasser survives the adoption of Fed.R.Evid. 104(a), which provides that in making threshold determinations the trial court is not bound by the rules of evidence, except those with regard to privileges. See United States v. Martorano, 561 F.2d 406, 408 (1st Cir.1977), cert. denied, 435 U.S. 922, 98 S.Ct. 1484, 55 L.Ed.2d 515 (1978). The Sixth Circuit has held that the proviso of Rule 104(a) "modifies prior law to the contrary", and that "hearsay statements themselves may be considered by the judge in deciding the preliminary question of admissibility." United States v. Vinson, 606 F.2d 149, 153 (6th Cir.1979), cert. denied, 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980). Most circuits, however, including this one, have continued to take the position that the preliminary determinations as to admissibility must be made on the basis of independent evidence. Government of the Virgin Islands v. Dowling, 633 F.2d 660, 665 (3d Cir.), cert. denied, 449 U.S. 960, 101 S.Ct. 374, 66 L.Ed.2d 228 (1980); United States v. Trowery, 542 F.2d 623, 627 (3d Cir.1976) (per curiam), cert. denied, 429 U.S. 1104, 97 S.Ct. 1132, 51 L.Ed.2d 555 (1977); United States v. James, 590 F.2d 575, 581 (5th Cir.) (in banc), cert. denied, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979). See also 1 Weinstein & Berger, Weinstein's Evidence p 104
 
 
 [4]
 Fed.R.Evid. 104 provides in relevant part:
 (a) Questions of admissibility generally. Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b). In making its determination it is not bound by the rules of evidence except those with respect to privileges.
 ....
 (c) Hearing of jury. Hearings on the admissibility of confessions shall in all cases be conducted out of the hearing of the jury. Hearings on other preliminary matters shall be so conducted when the interests of justice require or, when an accused is a witness, if he so requests.
 ....
 
 
 [5]
 The preliminary question of the admissibility of coconspirator statements under Fed.R.Evid. 801(d)(2)(E) is to be decided under Rule 104(a), rather than under Rule 104(b) to which the court referred. See 1 Weinstein & Berger, Weinstein's Evidence p 104, at 104-40; United States v. James, 590 F.2d at 579
 
 
 [6]
 For example, early in the trial, the court stated during a side-bar conference, "I have determined from the testimony admitted so far that there is a threshold evidence of a conspiracy." Tr. 432i. In context, we are satisfied that the court's reference to "threshold evidence of a conspiracy" encompassed defendants' participation
 
 
 [7]
 The trial court was, of course, correct that the jury must find each defendant's membership in the conspiracy beyond a reasonable doubt, but it may do so based on all of the evidence, including coconspirator statements, once that evidence has been properly admitted by the court
 
 
 [8]
 Stillman suggests that if the court had held an in limine hearing, he would have had the opportunity to question Ghassan as to his status. There is no evidence that Ghassan would have chosen to testify at such a hearing, and he could not have been compelled to do so. We reject Stillman's suggestion that it would have been appropriate to grant Ghassan judicial use immunity under Government of the Virgin Islands v. Smith, 615 F.2d 964 (3d Cir.1980). The exculpatory nature of Ghassan's would-be testimony is at best speculative, its necessity is questionable, and, in view of Ghassan's central role in the conspiracy, the government's interest in not having him granted immunity is considerable. See id. at 972
 
 
 [9]
 The trial judge's view of Ghassan's defense is reflected by his statement during the charging conference that he had "doubts as to whether there is sufficient evidence here to show under any set of facts that the defendant Ammar acted as an agent of the government in these transactions that are before us here." Tr. 4695; see also Tr. 4700
 
 
 [10]
 We reject Ghassan's claim that he did not receive an instruction on his defense theory. He apparently concedes that the court accurately summarized his position to the jury, but complains because the court did not explicitly state that if the jury concluded that Ghassan had a good faith belief that he was acting as an informant, it should find him not guilty. Inclusion of this language may have been preferable but we believe that the court's charge was adequate. Ghassan's theory of defense was not legally complicated; it was that he lacked the requisite intent. The court's charge did properly instruct the jury on the issue of intent. Viewed as a whole, the charge also adequately called the jury's attention to Ghassan's theory of the evidence. We find no error in the instructions. See United States v. Brake, 596 F.2d 337, 339 (8th Cir.1979)
 
 
 [11]
 Ghassan and Judith contend that they too were prejudiced by the admission of the Rossi-Ibraham conversation, on the ground that it contained references to them. Our rejection of Stillman's claim applies to them as well
 
 
 [12]
 Ghassan's statement was also admissible under Fed.R.Evid. 804(b)(3) as a declaration against his penal interest. See United States v. Lieberman, 637 F.2d 95, 103-04 (2d Cir.1980)
 
 
 [13]
 For the same reasons, we reject the Ammars' argument that there was a fatal variance between the single conspiracy charged in the indictment and what they claim were multiple conspiracies proved by the evidence at trial. The evidence was sufficient to justify a finding of a single, continuing conspiracy. See generally United States v. Boyd, 595 F.2d 120, 123 (3d Cir.1978) ("the government without committing a variance ... may establish the existence of a continuing core conspiracy which attracts different members at different times and which involves different sub-groups committing acts in furtherance of the overall plan"); United States v. Kenny, 462 F.2d 1205, 1216 (3d Cir.), cert. denied, 409 U.S. 914, 93 S.Ct. 233, 34 L.Ed.2d 176 (1972) (" Kotteakos [v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) ] prohibits charging multiple unrelated conspiracies, but it does not prohibit charging one master conspiracy and establishing at trial that under the master conspiracy more than one subsidiary scheme was involved")
 
 
 [14]
 The Advisory Committee Notes to Rule 801 state, in relevant part,
 The freedom which admissions have enjoyed from technical demands of searching for an assurance of trustworthiness in some against-interest circumstance, and from the restrictive influences of the opinion rule and the rule requiring firsthand knowledge, when taken with the apparently prevalent satisfaction with the results, calls for generous treatment of this avenue to admissibility.
 (citations omitted) (emphasis added).
 
 
 [15]
 In United States v. Lang, 589 F.2d 92 (2d Cir.1978), the same out-of-court statement was sought to be introduced as either a declaration against penal interest under Fed.R.Evid. 804(b)(3) or a coconspirator statement under Fed.R.Evid. 801(d)(2)(E). The court determined that the statement could not be admitted as a declaration against penal interest because of the absence of any showing of personal knowledge under Rule 602, but did not resolve the coconspirator statement issue in the same manner. Instead, it concluded that the statement was not admissible under Rule 801(d)(2)(E), not because of the lack of personal knowledge, but because it had not been made in furtherance of the conspiracy
 
 
 [16]
 Virtually all of the statements by Ghassan, Ibraham and Abedeen admitted under Rule 801(d)(2)(E) were made to other members of the conspiracy. In view of the importance of maintaining trust between conspirators, and the possibility that whatever was said by one might be relied upon by the others, the conspirators would have understood that a falsehood could have destroyed the enterprise in which they were jointly engaged. Moreover, many of the statements were made under circumstances which indicate spontaneity, decreasing the likelihood of deliberate falsehood
 
 
 [17]
 Furthermore, Welkie testified that the conspirators were planning to leave the country after Ghassan's release on bail. Tr. Jan. 16, 1981, at 127. Since we can infer that their purpose was to avoid prosecution, this provides additional support for our conclusion that the bail discussions between Ghassan and Judith were not privileged
 
 
 [18]
 The materials were referred to in Walden I as "rough notes and draft." After ordering a remand on another issue, we directed the trial court to inspect the materials (which we assumed still to be available) and determine whether they were "statements" within the Jencks Act and, if so, whether their non-disclosure was harmless. On remand, the district court found that the drafts had in fact been destroyed. Although the court determined that they had been Jencks Act "statements" and therefore should not have been destroyed, it concluded that their destruction was harmless error. United States v. Walden, 465 F.Supp. 255 (E.D.Pa.1978). We affirmed. 590 F.2d 85 (3d Cir.) (per curiam), cert. denied, 444 U.S. 849, 100 S.Ct. 99, 62 L.Ed.2d 64 (1979)
 
 
 [19]
 We have been advised that the DEA itself has adopted regulations requiring the retention of draft reports, at least in cases where no contemporaneous notes were taken. Because of our disposition of this issue, we need not decide whether, as appellants urge, the failure to follow these internal regulations would itself constitute a Jencks Act violation
 
 
 [20]
 Schedule I(b) includes
 unless specifically excepted or unless listed in another schedule, any of the following opium derivatives or salts, isomers, and salts of isomers whenever the existence of such salts, isomers and salts of isomers is possible within the specific chemical designation:
 * * *
 (10) heroin
 
 
 [21]
 The government requested the court to order Dr. Shapiro to test the substances, but the court refused because of Shapiro's testimony that he had other commitments which would make it impossible for him to do so for several weeks. Tr. 4219-20
 
 
 [22]
 After reading the jury the statutory definition of Schedule I controlled substances, the court stated:
 So if you find beyond a reasonable doubt that the substance in question which we have been dealing with is testified to as being found at various times, discovered or seized, is heroin, why, then, of course, that fulfills this definition of the statute. On the contrary, if you are not convinced beyond a reasonable doubt that the government has proved that this is heroin or one of the salts or isomers or salts of isomers, then, of course, you would find that the government has not made out a case and you should acquit the defendants.
 I will say that you are instructed as a matter of law that heroin is a controlled substance and you must ascertain whether the material in question was, in fact, heroin. In so doing, you may consider all evidence in the case which may aid in the determination of that issue, including the testimony of any experts or other witness who may testify to either support or dispute the allegation that the material in question was heroin. Again, you will note that salts, isomers or salts of isomers of heroin are included.
 Now, if you find the substance was actually heroin hydrochloride, a salt of heroin, then you may find it was heroin, a controlled substance under Schedule I. But, this, of course, you must find beyond a reasonable doubt.
 
 
 [1]
 United States v. Dennis, 183 F.2d 201, 230-231 (2d Cir.1950), aff'd, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951); United States v. Pugliese, 153 F.2d 497, 500 (2d Cir.1945); United States v. Nardone, 127 F.2d 521, 523 (2d Cir.), cert. denied, 316 U.S. 698, 62 S.Ct. 1296, 86 L.Ed. 1767 (1942); United States v. Renda, 56 F.2d 601, 602 (2d Cir.1932) (per curiam) (attributed to Judge Hand)
 
 
 [2]
 Only the Ninth Circuit even nominally retains the "prima facie" standard of proof. Judge Weinstein notes that this standard makes sense only in cases where the jury decides whether there is sufficient evidence aliunde to admit co-conspirators' statements into evidence, while the court only makes the initial decision to let the case go to the jury on the basis of a prima facie determination. 1 Weinstein & Berger, Evidence p 104, at 104-55 (1982). However, the Ninth Circuit characterizes the standard as requiring the government to adduce sufficient, substantial evidence aliunde of a conspiracy and of the defendant's connection thereto. See United States v. Perez, 658 F.2d 654 (9th Cir.1981); United States v. Zemek, 634 F.2d 1159 (9th Cir.1980), cert. denied, 450 U.S. 916, 101 S.Ct. 1359, 67 L.Ed.2d 341 (1981); cases cited in 1 Weinstein & Berger, supra, p 104 n. 54. The Fifth, Tenth and District of Columbia Circuits also require the district court as a preliminary matter to find "substantial evidence" of the existence of a conspiracy and the defendant's membership in it. The Fifth and Tenth Circuits require in addition a preponderance finding at the close of all testimony. See United States v. James, 590 F.2d 575 (5th Cir.) (en banc ), cert. denied, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979); United States v. Petersen, 611 F.2d 1313 (10th Cir.1979), cert. denied, 447 U.S. 905, 100 S.Ct. 2986, 64 L.Ed.2d 854 (1980); United States v. Jackson, 627 F.2d 1198 (D.C.Cir.1980). The other circuits, including this one, have adopted the fair preponderance of the evidence standard for the district court's preliminary determination. See cases cited in 1 Weinstein & Berger, supra, p 104 n. 44
 
 
 [3]
 [T]he fair and practicable method of providing protection to the defendant without violating the letter or spirit of the Rules lies in insisting on a stringent standard of proof.... Only if the court is itself convinced to a high degree of probability--considering hearsay as well as nonhearsay evidence--of the conspiracy, defendant's membership, and that the statement was made during the course of, and in furtherance thereof, should it admit
 
 
 [1]
 Weinstein & Berger, supra, p 104, at 104-43 to -44 (footnote omitted)
 
 
 [4]
 Welkie had also given a statement to his probation officer. Stillman moved for its production pursuant to 18 U.S.C. § 3500 (1976) (governing the production by the government of statements of its witnesses) as evidence tending to impeach Welkie. The district court held the statement "not discoverable in any event. That is a private paper prepared for the use of the Court." According to Stillman, the district court was required at least to compare Welkie's statement to his probation officer with his trial testimony, see United States v. Cyphers, 553 F.2d 1064, 1068-69 (7th Cir.), cert. denied, 434 U.S. 843, 98 S.Ct. 142, 54 L.Ed.2d 107 (1977); United States v. Figurski, 545 F.2d 389, 391-92 (4th Cir.1976). Stillman also sought to learn whether the DEA informant file on Welkie contained other versions of the event. The court quashed defendant's subpoenas of that file and refused to examine it in camera or to seal it for transmittal to this Court
 Only portions of Schmotzer's interrogation of Welkie on August 27 were tape recorded. During the cross-examination of Welkie, Stillman sought to obtain Schmotzer's notes of the unrecorded portions of the interview. The court held that the notes were not Welkie's "statements" under 18 U.S.C. § 3500 and ordered them sealed until after Schmotzer testified. The notes were then furnished to counsel, but when Welkie was recalled for further cross-examination, the court refused to allow counsel to question him based on the notes.
 Welkie also had written to his girlfriend, Judith Barlow, prior to his being released on bail. The government called Barlow as a witness, and Stillman subpoenaed Welkie's letters to her. The Court perceived the subpoena as invading Barlow's privacy, examined the letters in camera, and then permitted counsel to see only two small segments of the letters, quashing Stillman's subpoena as to the balance.
 Welkie stated that during the period about which he was testifying, he was a heavy user of heroin and also used angel dust. Stillman's expert testified that the use of these drugs could impair perception and memory and that angel dust could cause major perceptual distortions. Stillman then moved to have Welkie examined by any qualified person concerning the effect of these drugs on his memory and perception. The court apparently misperceived the thrust of Stillman's argument and denied the motion as one that questioned Welkie's competence as a witness.
 
 
 [5]
 As Judge Weinstein remarks:
 To the extent possible, the admissibility of coconspirators' statements should be discussed at the pre-trial conference, or if at trial, outside the hearing of the jury. At times, the court will be able to make its determination on the basis of proffers or even on the opening or what it knows of the available proof from the pretrial or suppression hearings.
 ....
 ... [I]n most cases the judge can determine from colloquy, documents marked in advance of trial, suppression hearings and one or two witnesses whether there is sufficient evidence to warrant admission of a coconspirator's statement.
 
 
 [1]
 Weinstein & Berger, supra, p 104, at 104-51 to -52 (footnote omitted)